**BUCKEYE FOREST COUNCIL
et al., Plaintiffs**

v.

**UNITED STATES FOREST SERVICE
et al., Defendants.**

**No. C–1–04–259.**

United States District Court,
S.D. Ohio,
Western Division.

Aug. 24, 2004.

Albert J. Slap, Glendale, OH, Leigh Haynie, Carencro, LA, for Plaintiffs.

Bridget Kennedy McNeil, Paul D. Barker, Jr., U.S. Department of Justice, Washington, DC, Jan Martin Holtzman, Cincinnati, OH, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

DLOTT, District Judge.

This matter comes before the Court on Plaintiffs' Motion for Temporary Restraining Order, or in the Alternative, Preliminary Injunction (doc. # 13) and Supplemental Motion for Preliminary Injunction (doc. # 17). For the reasons set forth below, Plaintiffs' motion for preliminary injunction is **GRANTED.**

## I. FACTUAL BACKGROUND

This is a civil case brought against the United States Forest Service ("Forest Service"), United States Fish & Wildlife Service ("Fish & Wildlife"), and employees and agents of the Forest Service in their official capacities. Plaintiffs Buckeye Forest Council ("Buckeye") and Heartwood ask for injunctive relief to prevent the Forest Service from proceeding with four timber sales in the Wayne National Forest. Two of the timber sales are part of the "Bluegrass Project" and two of the timber sales are part of the "Ironton Project." Buckeye and Heartwood allege that Defendants have violated or failed to adhere to procedures set forth in the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), the National Forest Management Act, 16 U.S.C. § 1600 *et seq.* ("NFMA"), the National Environmental Policy Act, 42 U.S.C. § 4332 *et seq.* ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* ("APA"), by authorizing the four sales, which Buckeye and Heartwood

allege will harm the federally endangered Indiana Bat.

The NFMA of 1976 requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). The Forest Service, which manages the System, develops land and resource management plans pursuant to NFMA and uses these forest plans to "guide all natural resource management activities." 36 C.F.R § 219.1(b).[1] Management activities of the Wayne National Forest are governed by the Land and Resource Management Plan ("Forest Plan").

The NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321. "NEPA itself does not mandate particular results" in order to accomplish these ends. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions. *See id.*, at 349–350, 109 S.Ct. 1835.

At the heart of NEPA is a requirement that federal agencies "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C). This detailed statement is called an Environmental Impact Statement (EIS). An EIS was prepared in conjunction with the Forest Plan in order to evaluate the Forest Plan's effects on the human environment.

During 1994, the Forest Service reviewed the possibility of implementing the Bluegrass Project, the goal of which was to move the Wayne National Forest closer to its historical condition, restoring native ecosystems vanishing from Southern Ohio. (AR Bk. I at 205.) Federal regulations allow an agency to prepare an Environmental Assessment (EA), a more limited document than an EIS, if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS. See §§ 1501.4(a)-(b). The EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R § 1508.9(a). If, pursuant to the EA, an agency determines that an EIS is not required under applicable federal regulations, it must issue a "finding of no significant impact" (FONSI), which briefly presents the reasons why the proposed

---

1. The planning rule at issue in this case was promulgated in 1982 and codified at 36 C.F.R. part 219. A revised planning rule was issued in November of 2000, but the Forest Service has delayed mandatory compliance with this rule until a new final rule is adopted. *See* 67 Fed.Reg. 35421 (May 20, 2002). The Bluegrass Ridge Project is thus governed by the 1982 regulations. (Doc. # 16 at 14 n. 3.)

agency action will not have a significant impact on the human environment. See 40 C.F.R. §§ 1501.4(e), 1508.13. *See generally Dept. of Transp. v. Public Citizen,* —— U.S. ——, 124 S.Ct. 2204, 2209–10, 159 L.Ed.2d 60 (2004). The Forest Service performed an EA for the Bluegrass Project in order to examine the potential environmental consequences of the Project.

In order to meet the goals of the Project, the Forest Service proposed in the EA several alternative courses of action and analyzed each one in conjunction with the Plan as a whole to determine the cumulative environmental effects, such as, *inter alia,* forest fragmentation and biodiversity, caused by each alternative. (AR Bk. I at 214–248.) The Forest Service sent the EA to interested parties and solicited public comment. (*Id.* at 257.) On November 3, 1994, the District Ranger for Wayne National Forest issued a Decision Notice and Finding of No Significant Impact ("FONSI") to adopt Alternative Two, which included thinning, prescribed burning, and select tree cutting. (AR Bk. II at 303.) The two timber sales constituting the Bluegrass Project[2] were awarded in 1995.

Plaintiff Buckeye challenged the two sales in 1996 and the Forest Service entered into a consent decree with Buckeye that resulted in the Forest Service remarking the cutting areas of the sales. The two sales were enjoined during 1997 and 1998 during a lawsuit challenging the Forest Plan.[3] After the injunction was lifted, timber cutting remained suspended while the Forest Service investigated the discovery of the Indiana Bat in the forest. At the time that the Bluegrass EA was conducted in 1994, the federally endangered Indiana Bat was not known to in-

habit the Wayne National Forest, but from 1997–2000, the Forest Service discovered a number of Indiana Bats at Wayne National Forest and specifically near the Bluegrass Project site.

The ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species ..." 16 U.S.C. § 1536(a)(2). If an agency determines that action it proposes to take may adversely affect a listed species, it must engage in formal consultation with Fish & Wildlife. *Id.;* 50 C.F.R. § 402.14. After formal consultation, Fish & Wildlife must provide the agency with a Biological Opinion ("BiOp") explaining how the proposed action will affect the species or its critical habitat. 16 U.S.C. § 1536(b)(3)(A). If Fish & Wildlife concludes that the proposed action will jeopardize the continued existence of an endangered species or result in the destruction or adverse modification of its critical habitat, the BiOp must outline any "reasonable and prudent alternatives" that Fish & Wildlife believes will prevent that consequence. 16 U.S.C. § 1536(b)(3)(A). If Fish & Wildlife concludes that the agency action will not result in jeopardy to the endangered species or if Fish & Wildlife offers reasonable and prudent alternatives to avoid that consequence, Fish & Wildlife must provide the agency with an Incidental Take Statement specifying "the impact of such incidental taking on the species," and "reasonable and prudent measures that [Fish & Wildlife] considers necessary or appropriate to minimize such impact," and setting forth "the terms and conditions

---

**2.** The Markin ·Fork sale and the Bluegrass Ridge sale constitute the Bluegrass Project.

**3.** *See Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

... that must be complied with by the Federal agency ... to implement [those measures]." 16 U.S.C. § 1536(b)(4).

In March of 2001, the Forest Service conducted a Biological Assessment to analyze the effect of the continued implementation of the Forest Plan on the Indiana Bats and other endangered species. The Forest Service concluded that the Forest Plan might adversely affect the Indiana Bat, and therefore entered into formal consulting with Fish & Wildlife. After formal consultation, Fish & Wildlife issued a BiOp on September 20, 2001 concluding that the continued implementation of the Forest Plan was not likely to jeopardize the continued existence of the Indiana Bat. (AR Bk. IV at 65–66.) Fish & Wildlife recognized that an allowable amount of harm, or "incidental take," would befall the Indiana Bat (*id.* at 67) and set forth nine Terms and Conditions that the Forest Service was required to follow in order to minimize such incidental take (*id.* at 69–72). Finally, the BiOp set forth a tiered consultation system by which the Forest Service was required to submit site-specific project proposals to Fish & Wildlife to determine whether proposed projects might adversely affect endangered species, and, if Fish & Wildlife found an adverse effect, it would issue a "Tier II" BiOp with a project specific incidental take statement (*id.* at 43) and proposed mitigation measures to allay that effect.

Following the issuance of Fish & Wildlife's 9/20/01 BiOp, the Forest Service issued a new biological evaluation in February 2002, analyzing the impact of the Bluegrass Project on the Indiana Bat in light of Fish & Wildlife's Terms and Conditions. The biological evaluation concluded that, as revised by the Terms and Conditions set forth in Fish & Wildlife's 9/20/01 BiOp, the Bluegrass Project would not jeopardize the continued existence of the Indiana Bat. (AR Bk. II at 449.) In July and September of 2002 the Forest Service issued supplemental EA documents and invited public comment, as required by NEPA. In December of 2002, the District Ranger signed a FONSI concluding that the effects of the Bluegrass Project would not significantly impact the human environment. (AR Bk. II at 509.) On November 25, 2003, after considering the impact of the Bluegrass Project in accordance with the tiered system outlined in its 9/20/01 BiOp, Fish & Wildlife issued a "Tier II BiOp," concluding that the Bluegrass Project would not jeopardize the continued existence of the Indiana Bat and setting forth a separate incidental take statement for the Project. (*Id.* at 561.)

In the meantime, the Wayne National Forest also amended the Forest Plan to incorporate the Terms and Conditions set forth in Fish & Wildlife's 9/20/01 BiOp. The Forest Service undertook a biological evaluation of the Forest Plan in November of 2002 and compared three alternative courses of action, including incorporation of the Terms and Conditions into the Forest Plan. The Forest Service concluded that the amendment of the Forest Plan to incorporate the Terms and Conditions of the 9/20/01 BiOp would not adversely affect the Indiana Bat. (AR Bk. IV at 199–200.) Fish & Wildlife issued a concurrence letter. (*Id.* at 238.) On May 1, 2003 the Forest Service issued an EA analyzing the environmental impacts of such an amendment (Bk. IV at 330) and issued a FONSI adopting the Forest Plan Amendment for Threatened and Endangered Species. (Bk. IV at 244.)

Meanwhile, a severe ice storm in February of 2003 damaged and uprooted a substantial number of trees in the Ironton District of Wayne National Forest. The Forest Service proposed the Ironton Heavy Fuelwood Project to clear away the

debris and prevent an increased risk of forest fire in the Ironton District and on private property near the District. (AR Bk. III at 29.) On August 4, 2003, the Forest Service invited public comment on the proposed project (*id.* at 66) and conducted a biological evaluation regarding the effects of the proposed project on endangered species (*id.* at 147). The biological evaluation concluded that the Terms and Conditions of the 9/20/01 BiOp could not be satisfied due to the effects of the ice storm itself. (*Id.* at 153.) The Forest Service therefore requested reinitiation of formal consulting with Fish & Wildlife on the Ironton Project.

On December 31, 2003, Fish & Wildlife issued a "Tier II" Biological Opinion finding that, under the ESA, the Ironton Project would not jeopardize the existence of the Indiana Bat. (*Id.* at 168.) The Forest Service issued a Decision Memo implementing the Ironton Project, concluding that the project fell within one of the Categorical Exclusions from the NEPA and thus no EA or EIS was required.

Plaintiffs Buckeye and Heartwood filed suit on April 13, 2004 alleging violations of ESA, NFMA, NEPA, and the APA. On August 4, 2004, this Court granted Plaintiffs' motion for an order temporarily restraining the United States Forest Service from permitting any logging or ground disturbing activity under the authority of the Bluegrass Ridge Decision Notice and Finding of No Significant Impact and the Ironton Heavy Fuelwood Decision Memo and on August 14, 2004 extended the order for ten additional days pursuant to Federal Rule of Civil Procedure 65(b). On August 18, 2004, the Court held a hearing on Plaintiffs' motion for preliminary injunction.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the Court to grant a prelimi-nary injunction. When deciding whether to issue a preliminary injunction, the Court considers four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir.2000). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985). A district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are determinative of the issue. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club,* 325 F.3d 712, 717 (6th Cir.2003).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

Plaintiffs Buckeye and Heartwood bring claims under the APA alleging violations of ESA, NEPA, and NFMA.

#### 1. Endangered Species Act Claims

Buckeye and Heartwood bring four ESA claims against Defendants, essentially claiming that Defendants violated the ESA by failing to undertake formal consultation culminating in a BiOp for the Bluegrass and Ironton Projects.

Regarding the Ironton Project, Defendants assert that this Court does not have jurisdiction over Plaintiffs' ESA claims related to that Project because Plaintiffs have not complied with ESA's

sixty-day notice requirement of intent to sue. 16 U.S.C. § 1540(g) permits citizens to sue to enforce compliance with the Act. 16 U.S.C. § 1540(g)(1)(A). Before a citizen can file an action, however, the citizen must give the Secretary of the Interior and any alleged violators written notice of intent to sue sixty days prior to filing suit. 16 U.S.C. § 1540(g)(2)(A)(i). This requirement is jurisdictional. *Save the Yaak Comm. v. Block,* 840 F.2d 714, 721 (9th Cir.1988). In *Bennett v. Spear,* 520 U.S. 154, 174, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the Supreme Court held that challenges to the adequacy of biological opinions against the Secretary of the Interior, when acting in his capacity as Administrator of the Endangered Species Act, are not properly pled as citizen suit claims under § 1540(g)(1)(A). The Court then held that such claims could be pled under the Administrative Procedure Act, which authorizes courts to set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706). Actions under the Administrative Procedure Act do not require the sixty-day notice requirement set forth in the Endangered Species Act. Therefore, failure to provide such notice does not deprive the court of jurisdiction to entertain such claims. *American Rivers v. National Marine Fisheries Service,* 126 F.3d 1118, 1124–25 (9th Cir.1997).

Plaintiffs argue that after the February 2002 biological evaluation of the Bluegrass Project found that the Indiana Bat might be adversely affected by the Bluegrass Project, the Forest Service was required to initiate formal consultation with Fish & Wildlife, culminating in a BiOp, and that Defendants did not do so. Defendants contend that they did, in fact, engage in formal consulting resulting in a BiOp for both the Bluegrass and Ironton Projects because they complied with the tiered consultation system set forth in Fish & Wild-

life's 9/20/01 BiOp of the general Forest Plan, requiring that site-specific proposals with a possible adverse effect on endangered species had to be submitted to Fish & Wildlife for a "Tier II BiOp" with its own Incidental Take Statement. At the August 18, 2004 hearing, Plaintiffs conceded that they do not necessarily contend that the tiered consultation system fails to meet the requirements for formal consultation, but, regardless, they believe that a FONSI under the NEPA is incompatible with a "no jeopardy" finding under the ESA.

Defendants admit that tiered consultation is not explicitly described in ESA or its implementing regulations but contend that tiered consultation is a more efficient way for agencies to meet their consultation obligations. (Doc. # 19 at 6.) Defendants cite to an unpublished District of Washington case, *Pacific Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries,* No. 97–CV–775, 1998 WL 1988556 (W.D.Wash. May 29, 1998), and a Ninth Circuit case, *Gifford Pinchot Task Force v. United States Fish & Wildlife Service,* 378 F.3d 1059 (9th Cir.2004) for the proposition that a tiered consultation system fulfills their ESA obligations. In *Gifford,* however, unlike in this case, the Forest Plan at issue had already survived a legal challenge and the Ninth Circuit specified that it was not an ordinary land management plan but rather a particularly thorough and complex one. *Id.* at 1067–68. Additionally, effectiveness monitoring for the Forest Plan was also in effect, which is not the case here. *Id.* Thus, while the Court may ultimately find such cases persuasive after further briefing, it is not yet clear on the basis of arguments made at the preliminary injunction hearing that the tiered consultation system in this case fulfills Defendants' ESA obligations.

## 2. National Environmental Policy Act Claims

Buckeye and Heartwood bring seven NEPA claims against the Forest Service but allow that only some are relevant at this juncture. Plaintiffs allege that the Forest Service violated NEPA by failing to issue a new Decision Notice, failing to prepare an EIS, and issuing a FONSI in connection with the Bluegrass Project. Plaintiffs also claim that the Forest Service violated NEPA by failing to consider the cumulative impacts of the Bluegrass and Ironton Projects.

### a. Failing to Issue a New Decision Notice for the Bluegrass Project

The failure to issue a new Decision Notice does not itself appear to violate NEPA or its implementing regulations. Plaintiffs argue that since the supplemental EA on the Project was issued nine years after the first EA and after discovery of the Indiana Bat, relying on the original Decision Notice is arbitrary and capricious. Section 1909.15 of the Forest Service Handbook instructs that if there exists new information or changed circumstances concerning a project, the Forest Service should revise the EA and prepare a FONSI (if appropriate), and, based upon the EA and FONSI, issue a new decision notice or *document that the original decision is to remain in effect and unchanged.* (AR Bk. IX at 2134.) The Forest Service revised the EA and prepared a new FONSI—since the original decision to proceed with the project had not changed, it would appear that the Forest Service was not required to prepare a new Decision Notice, but only to document that the original decision was to remain unchanged. The Forest Service did so. (AR Bk. II at 512.)

### b. Failing to Prepare an EIS for the Bluegrass Project

■ In determining whether the acting agency properly decided not to conduct an EIS, the Court may not "substitute its judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Kelley v. Selin,* 42 F.3d 1501, 1518–1519 (6th Cir.1995) Hence, the Court is limited to examining whether the Forest Service took a "hard look" at the environmental consequences of the Bluegrass Project prior to issuing the FONSI. *Id.; Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373–74, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

Plaintiffs argue that an EIS was required because the Bluegrass Project is "associated with various indicators of 'significance'" set out in the federal regulations (doc. # 1 at 17):

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas . . .

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts . . .

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

40 CFR § 1508.27.

Plaintiffs refer to indicators (7) and (9): cumulative impact and degree to which the Project will adversely affect an endangered species. After discovering the Indiana Bat on the Wayne National Forest, the Forest Service undertook a supplemental EA that analyzed the Bluegrass Project in terms of both cumulative impact and effect on the Indiana Bat. The EA discussed the Terms and Conditions imposed by the 9/20/01 BiOp in order to avoid adversely impacting the Indiana Bat. (AR Bk. II at 470). The EA found that applying the Terms and Conditions of the BiOp would be a relatively simple process, involving deducting trees from the project that would provide potential bat roosts (*Id.*

at 467.) The Forest Service therefore found that the Bluegrass Project would *not* cause a significant impact and accordingly issued a FONSI. (AR Bk. II at 509.) In the FONSI, the Forest Service discussed each factor listed in 40 CFR § 1508.27, including cumulative effects and effects on endangered species, and concluded that the context and intensity of the project did not rise to the level of a significant effect on the human environment.

The Forest Service does appear to have seriously considered the significance of the Bluegrass Project in relation to the Indiana Bat. It undertook a new biological assessment of the Forest Plan, a new biological evaluation specifically addressing the Bluegrass Project, a supplemental EA for the Bluegrass Project, and a FONSI. Given this extensive analysis, it is difficult to conceive that the Forest Service failed to take a "hard look" at the environmental consequences of the Bluegrass Project.

### c. Failing to Consider Cumulative Impact of Bluegrass and Ironton Projects Together

Plaintiffs claim that the Forest Service violated NEPA by failing to consider the cumulative impacts of the Ironton and Bluegrass Projects on the Indiana Bat. Plaintiffs claim that other thinning/burning activities have been proposed, and the Forest Service has failed to evaluate the cumulative effect of the Ironton and Bluegrass Projects along with these proposed projects. This argument is not well taken—logic dictates that an agency should evaluate the cumulative effects of later proposed projects in considering whether to adopt them rather than to reevaluate prior projects' cumulative effects in terms of later projects.

Plaintiffs' challenge to the Forest Service's consideration of the cumulative effects of the Bluegrass and Ironton Pro-

jects together, however, bears greater consideration. The Bluegrass EA and FONSI did not consider the Ironton Project because the ice storm occurred after they were issued; the Forest Service did not produce an EA for the Ironton Project because the Forest Service determined that it fell within a Categorical Exclusion of NEPA, negating the EA and EIS requirements. The Forest Service did examine the cumulative impact of the two projects, however, in the biological evaluation it conducted concerning the Ironton project in December of 2003. (AR Bk. III at 157.) Fish & Wildlife's "Tier II BiOp" also evaluated the incidental take of the Indiana Bat in the Ironton Project in conjunction with other activities and concluded that it was acceptable. (AR Bk. III at 168.) Though Fish & Wildlife's analysis does not appear to be particularly detailed, it is not clear that Plaintiffs can show that the Forest Service failed to take a "hard look" at the cumulative impact of the projects.

### 3. National Forest Management Act Claims

Finally, Plaintiffs claim that the Forest Service violates the NFMA because it has failed to maintain a viable population of Indiana Bats. The NFMA requires Wayne National Forest to develop a Forest Plan, 16 U.S.C. § 1604(a), and all site specific activities must be consistent with that Plan. 16 U.S.C. § 1604(I); 36 C.F.R. § 219.10(e). NFMA requires that the Forest Service "provide for diversity of plant and animal communities" in managing national forests. 16 U.S.C. § 1604(g)(3)(B). Plaintiffs argue that Defendants' scientific analysis of the Indiana Bat's viability under the Terms and Conditions imposed by the 9/20/01 BiOp is insufficient. Defendants respond that the Forest Service's data was based on the best available data and science concerning the Indiana Bat and that Defendants are entitled to rely on the best available science, even if Plaintiffs contend that such science is insufficient.

In sum, Plaintiffs have raised a number of issues under the complicated and intertwined framework of the ESA, NEPA, and NFMA that require closer examination of the administrative record.. In balancing the likelihood of success on the merits prong with the other preliminary injunction considerations, "[i]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *In re DeLorean Motor Co.*, 755 F.2d at 1229 (quoting *Brandeis Machinery & Supply Corp. v. Barber–Greene Co.*, 503 F.2d 503, 505 (6th Cir.1974) (internal quotation omitted)).

### B. Irreparable Harm

■ Were the Court to deny Plaintiffs' motions for preliminary injunction, the Forest Service would proceed with the timber sales and would follow the Projects' plans for tree cutting, thinning, logging, and prescribed burning. When this occurs, the Court will be powerless to further examine the merits of Plaintiffs' claims because the trees will have already been cut down. Plaintiffs claim the Defendants have performed insufficient scientific analysis with faulty data and have arrived at incompatible results. Although Plaintiffs may not ultimately prevail on the merits, if an injunction does not issue and the trees are cut down, Plaintiffs will not have an opportunity to even argue the case on the merits because the alleged harm will have already occurred. The balance of equities therefore weighs heavily in favor of preserving the status quo.

### C. Harm to Others

■ The Forest Service argues that if the Court enjoins it from proceeding with

the Ironton Project, the Forest Service will be unable to remove the ice storm salvage from the Forest in an economical matter. The Forest Service contends that the salvage wood poses a fire risk that should be removed and that removal will be economically onerous if the passage of time causes the wood to degenerate and lose value such that the Forest Service, rather than a contractor, will have to pay to remove the salvage. In consideration of the economic burden an injunction would impose on the Forest Service, the Court will set an expedited briefing schedule for the parties' cross-motions for summary judgment. The Ironton salvage has remained on the forest floor during the eighteen months following the February 2003 ice storm; expedited briefing will ensure that the salvage remains in limbo for no more than six additional months.

### D. Public Good

██ The public interest is served by granting a preliminary injunction so that all parties can research and argue an extremely complex case with a voluminous administrative record while posing the least risk to an endangered species.

### IV. CONCLUSION

Because the claims in question involve a complicated and intertwined set of statutes and regulations and because the severity of the potential injury to Plaintiffs is so great, the Court **GRANTS** Plaintiffs' motions for preliminary injunction (docs.# 13, 17). The Court will contact counsel to arrange a status conference in which an expedited briefing schedule will be set.

IT IS SO ORDERED.