**FOREST GUARDIANS, Plaintiff,**

v.

**Ann M. VENEMAN, et al., Defendant.**

**No. CV03–451–TUC–CKJ.**

United States District Court,
D. Arizona.

March 31, 2005.

Robert Baxter Wiygul, Waltzer & Associates, Biloxi, MS, for Plaintiff.

Robert L. Gulley, Esq., Jean Williams, US Dept of Justice, Washington, DC, for Defendant.

## ORDER

JORGENSON, District Judge.

Pending before the Court are Plaintiff's Motion for Summary Judgment and Defendants' Cross–Motion for Summary Judgment. For the reasons stated below, Plaintiff's motion is denied and Defendants' motion is granted.

### I. *Background*

#### A. Threshold Issue Regarding the Definition of "Jeopardy"

On November 15, 2004, the Court sent out an Order discussing some procedural issues that have arisen in this case, and the Order also sought briefing from the parties in relation to the definition of "jeopardy." The Order stated in relevant part:

> In a recent ruling in *New Mexico Cattle Growers Assoc., et. al. v. U.S. Fish and Wildlife Service, et. al.* (CIV. 02–199 JB/LCS), Judge Browning of the United States District Court for the District of New Mexico vacated the critical habitat of the spikedace and loach minnow. In light of this ruling, the parties filed a stipulation with the Court in October of 2004 agreeing that "Forest Guardians

claims involving the standard used to determine adverse modification of critical habitat, and the validity of that determination in this case are moot." However, the parties further stipulated that the remaining claims in this case can proceed to a decision before this Court.

The remaining claims in this case are related to the Fish & Wildlife Service's ("FWS") finding that there would be no jeopardy to the spikedace and loach minnow as a result of allowing grazing to continue on the allotments at issue in this case. As the parties concede that this issue is still properly before the Court, an issue has arisen which the parties have not had an opportunity to address, and which needs to be addressed before the Court will issue a decision in this case. After Plaintiff's Motion for Summary Judgment and Defendants' Cross Motion for Summary Judgment were fully briefed, a decision from the Ninth Circuit was issued which invalidated the FWS's regulation defining critical habitat. The parties both notified the Court of this decision, which is *Gifford Pinchot Task Force v. United States Fish & Wildlife Service,* 378 F.3d 1059 (9th Cir.2004).

In relation to a jeopardy determination, " 'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, **directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species ...** " 50 C.F.R. § 402.02 (emphasis added). In relation to damage to critical habitat, " 'Destruction or adverse modification' means a **direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species.**" *Id.* (emphasis added).

In ruling that the destruction or adverse modification of critical habitat regulation was invalid, the Ninth Circuit reasoned:

This regulatory definition explicitly requires appreciable diminishment of the critical habitat necessary for survival before the 'destruction or adverse modification' standard could ever be met. Because it is logical and inevitable that a species requires more critical habitat for recovery than is necessary for the species survival, the regulations singular focus become 'survival' ... the regulatory definition reads the 'recovery' goal out of the adverse modification inquiry; a proposed action 'adversely modifies' critical habitat if, and only if, the value of the critical habitat for *survival* is appreciably diminished ... The FWS could authorize the complete elimination of critical habitat necessary only for recovery, and so long as the smaller amount of critical habitat necessary for survival is not appreciably diminished, then no 'destruction or adverse modification,' as defined by the regulation, has taken place. This cannot be right. If the FWS follows its own regulation, then it is obligated to be indifferent to, if not to ignore the recovery goal of critical habitat ... The agency's controlling regulation of critical habitat thus offends the ESA because the ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted. *Gifford Pinchot Task Force,* 378 F.3d at 1069–1070. The Ninth Circuit went on to cite various statutory provisions supporting its conclusion that Congress intended the ESA to foster conservation and the recovery of listed species. *See id.* at 1070–1071; *see also* 16 U.S.C. § 1531(b) ("The purposes of [the ESA] are to provide a means whereby the

ecosystems upon which endangered and listed species depend may be conserved, to provide a program for the conservation of such endangered and threatened species ...."); 15 U.S.C. § 1536(a)(1)("The Secretary shall review other programs administered by him and utilize such programs in furtherance of [the ESA]. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered and threatened species ...."); 16 U.S.C. 1532(3) (defining conservation as the "use of all methods and procedures which are necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary.").

As noted above, the regulatory definitions relating to "destruction or adverse modification of critical habitat" and "jeopardize the continued existence" of listed species are worded in essentially the same manner. Both refer to an action appreciably reducing both the survival and recovery of the listed species. As the "jeopardize the continued existence of" definition is worded in the conjunctive like the definition of "destruction or adverse modification of critical habitat," it seems that the interpretation in *Gifford Pinchot Task Force* compels the conclusion that the regulatory definition for jeopardy reads out the "recovery" aspect in a jeopardy analysis, with the sole focus on survival. In other words, it is possible that an action could harm a listed species' prospects for recovery, without necessarily threatening its bare survival. However, the opposite is not true; an action that harms a listed species' prospects for survival would reduce its ability to recover. As such, in light of *Gifford Pinchot Task*

*Force,* the Court has concerns about the regulatory definition of "jeopardize the continued existence of." The Court is aware that the Fifth Circuit in *Sierra Club v. U.S. Fish and Wildlife Service,* 245 F.3d 434 (5th Cir.2001), found the "destruction or adverse modification of critical habitat" definition to be invalid like the court in *Gifford Pinchot Task Force,* but specifically ruled that definition of "jeopardize the continued existence of" was still valid. *See id.* at 441–443 and 443 n. 61. However, the court in *Gifford Pinchot Task Force* never directly addressed or specifically ruled that the definition of "jeopardize the continued existence of" was still valid. As the parties have not had an opportunity to address these issues, the Court is ordering additional briefing as to how the Ninth Circuit would treat the "jeopardize the continued existence of" definition in light of the decision in *Gifford Pinchot Task Force.*

On December 15, 2004, the parties (including amici curiae) filed their briefs discussing this issue. After reviewing these briefs, the Court finds that *Gifford Pinchot Task Force* does not compel the Court to find that the definition of "jeopardy" is invalid. As Defendants correctly point out, the Ninth Circuit did not address whether the agencies' interpretation of the ESA was permissible, and it did not mention recovery in upholding FWS's no jeopardy determinations. Further, in relation to the definition of "destruction or adverse modification," the Ninth Circuit's holding focuses primarily on two definitions in the ESA tied to critical habitat, but which are not specifically tied to jeopardy. First, the Ninth Circuit noted that the ESA defines the term **"conservation"** as "all methods that can be employed to 'bring any endangered species to the point at which the measures provided pursuant to the [ESA] are no longer necessary." *Id.* at 1070

(quoting 16 U.S.C. § 1532(3)). Thus, pursuant to this definition, "conserving" the species is equivalent to "recovering" the species. The Ninth Circuit then pointed out that the ESA defines "critical habitat" in terms of the geographical areas "essential for **conservation**" of a species": "the specific areas ... occupied by the species ... which are ... essential to the **conservation** of the species' and the specific areas outside the geographical area occupied by the species ... that ... are essential for the **conservation** of the species." (quoting 16 U.S.C. § 1532(5)(A) (emphasis added)). Thus, as Defendants correctly point out, in contrast to "jeopardy," the *Gifford Pinchot Task Force* decision is grounded on the fact that the "adverse modification" in relation to critical habitat is itself specifically defined in terms of recovery. In light of these distinctions, the Court finds that the logic in *Gifford Pinchot Task Force* does not compel the conclusion that the definition of jeopardy is invalid. Further, a review of the briefs and the relevant case law shows that there are no controlling cases on point which have invalidated the long-standing definition of jeopardy. Accordingly, the Court finds that the FWS's definition of jeopardy is still valid.

### B. Legal and Regulatory Background on the ESA

As the parties have already stipulated that the adverse modification of critical habitat issue is moot, the Court need only address the FWS's no jeopardy determination in this case.

Generally, Section 7 of the Endangered Species Act ("ESA") requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species ..." 16 U.S.C. § 1536(a)(2). In order to achieve this objective, the agency proposing the action must consult, as relevant to this litigation, with the FWS whenever its action "may affect" a threatened or endangered species. 50 C.F.R. § 402.14(a). If the agency determines that its action will have no affect on an endangered or threatened species, it need not engage in "formal consultation," and the FWS need not concur in this determination. *See Southwest Center for Biol. Div. v. United States Forest Service,* 100 F.3d 1443, 1447–48 (9th Cir.1996); *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 8 (9th Cir. 1994), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). However, formal consultation resulting in a biological opinion, as in this case, occurs if the action may affect a listed species. In making such a determination, the agency "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). In relation to a jeopardy determination, " 'Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species ...' " 50 C.F.R. § 402.02. As noted above, the jeopardy definition is worded in the conjunctive, referring to an action appreciably reducing both the survival and recovery of the listed species. In other words, it is possible that an action could harm a listed species' prospects for recovery, without necessarily threatening its bare survival. However, the opposite is not true; an action that harms a listed species' prospects for survival would reduce its ability to recover. As Defendants point out in their reply brief, pursuant to FWS regulations, a jeopardy determination is warranted only if there is harm to both survival and recovery. *See* Defendants' Reply Brief at 11, n. 12 (FWS explained that the word "both" was added to emphasize that, except in certain exceptional circumstances, injury to recovery alone would not warrant the issuance of a 'jeopardy' biolog-

ical opinion. 51 Fed.Reg. at 19,934. In fact, FWS rejected a commentator's suggestion that injury to recovery for an already depleted species would require the issuance of a jeopardy opinion, explaining that the "continued existence of the species is the key to the jeopardy standard, placing an emphasis on injury to a species' 'survival.'" *Id.*) Accordingly, as this regulation is still valid, as long as the continued grazing at issue does not appreciably reduce both the survival and recovery of the species, the FWS's no jeopardy determination must be upheld under the applicable deferential standard of review. *See Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1097 (9th Cir.2003)( [T]he Service is entitled to substantial deference to its interpretation of its own regulations ... Indeed, judicial review of an agency's interpretation of its own regulations is limited to ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation.).

## II. *Factual Background*

This case stems from the United States Fish & Wildlife Service's ("FWS") biological opinion ("BO") addressing the effects of authorization or re-authorization of livestock grazing on sixteen allotments of land on the Apache–Sitgreaves National Forest ("Forest") located in Apache and Greenlee Counties, Arizona. Specifically, Plaintiff challenges the BO as arbitrary and capricious based on the FWS's no jeopardy finding as to the spikedace and loach minnow.

The loach minnow and spikedace are small fish that have experienced serious population crashes due to various historic practices, including grazing. *See* BO at 125–128. The spikedace and loach minnow now only inhabit 10–20% of their historic range. *See* BO at 125–128. They currently occupy parts of the Blue and San Francisco Rivers in the Apache–Sitgreaves National Forest. There is no dispute, as

recognized throughout the BO, that historically, the effects of grazing have had direct adverse effects on the loach minnow and spikedace through serious degradation of the Blue and San Francisco rivers. *See* AR at 97–99, 126–129. As such, the FWS listed the spikedace and loach minnow as threatened in 1986, and has recognized since 1994 that their declining populations warrant listing as endangered. Removal of vegetative cover, increased erosion, increased runoff, erosion and sedimentation of the rivers, and alteration of the hydrologic regime are among the adverse effects grazing has had on the habitat of the spikedace and loach minnow. Further, it is also undisputed, as recognized by the FWS throughout the BO, that the historic effects of grazing and continued grazing activities would continue to adversely affect the loach minnow and spikedace. *See* AR at 97–99, 126–129.

The Forest Service recognized, for example, that "the existing conditions of the aquatic and riparian habitat within the [Turkey Creek] allotment are highly degraded from past and ongoing management activities, and provide little or no buffering or filtering capability before entering critical habitat ..." *See* BO at 67. The FWS also recognized that in regards to this allotment, "range, soil, and riparian conditions are severely deteriorated, and that components of the proposed action, such as utilization levels and/or herd size, exceed those that would promote sustainable and healthy rangelands given current range conditions. Because of the degraded range conditions and proposed utilization levels, the FWS believes that degradation of the various watersheds, and ultimately Campbell Blue Creek, the Blue River, and the San Francisco River, will continue." *See* BO at 105.

Throughout the BO, the FWS recognizes that the grazing allotments in ques-

tion are in poor condition and that continuing grazing would contribute to the deterioration of the watershed. The FWS recognized "that some of the impacts to the watersheds in which the proposed action would be occurring have been caused by past grazing, private lands use, agriculture, roads, or other human activities." *See* BO at 101. However, the FWS still noted that "livestock grazing on the 16 allotments included within the proposed action area has contributed, and continues to contribute, to the overall degradation of the allotments and the Blue and San Francisco rivers, as well as other named and unnamed perennial and intermittent drainages, and to sub-optimum watershed conditions and functions within and downstream of the Allotments." *See* BO at 102.

Ultimately, despite the historic effects of grazing and the continuing effects of grazing, the FWS concluded that the proposed action would not jeopardize the continued existence of the spikedace and loach minnow.

As to the spikedace, the FWS concluded: After reviewing the current status of the spikedace, the environmental baseline for the action area, the effects of the proposed reauthorization of livestock grazing on 16 allotments of the Alpine and Clifton Ranger districts of the Apache National Forest, and the cumulative effects, it is our biological opinion that the action, as proposed, is not likely to jeopardize the continued existence of, or destroy or adversely modify designated critical habitat for, the spikedace within complex 6. **The changes made by the Forest Service to reduce the number of cattle and season of use on the Allotments on the Alpine Ranger District, combined with removal of cattle from the mainstem Blue and San Francisco rivers, has, in our opinion, removed the threat of jeopardy and**

**adverse modification from the proposed action.** In the Final Rule designating critical habitat for spikedace and loach minnow ... we noted that "Because of these species' precarious status, mere stabilization of spikedace and loach minnow at their present levels will not achieve conservation. Recovery through protection and enhancement of the existing populations, plus reestablishment of populations in suitable areas of historical range, are necessary for their survival." We conclude that while there is no jeopardy or adverse modification, the proposed action will adversely affect the survival and recovery of spikedace for the following reasons:

*Spikedace are limited in distribution to 289 miles of stream in portions of the Gila River, lower San Pedro River, Aravaipa Creek, and Eagle Creek. They are likely still present, but appear to be in declining numbers, in the Verde River. Its present range is 10 to 15 percent of its historic range, and is now only common in Aravaipa Creek and portions of the upper Gila River. Because of this limited range and distribution, habitat along the Blue and San Francisco rivers is essential to the survival, and particularly the recovery, of this species.

*The proposed action covers 279,681 acres which are in degraded riparian, range, soil conditions. The FWS recognizes that, in part, these conditions are due to past actions. Conditions can be summarized as follows [a summary chart appears on page 126 of the BO].

The proposed actions would continue grazing when the environmental baseline is degraded, and we believe continued grazing of this area will perpetuate current conditions or preclude or delay recovery. We are specifically concerned that utilization rates remain higher than suitable on areas that are already degraded. **However, we believe the re-**

cent reductions in cattle numbers and seasons of use, combined with removal of the cattle from the mainstem Blue and San Francisco rivers, will prevent the proposed action from jeopardizing the continued existence of the fish, and will not result in adverse modification of habitat. We anticipate that some degradation will continue, as the on-going degradation in this area will take some time to slow, halt, and reverse to improvement of conditions.

*See* BO at 125–128.

As to the loach minnow, the FWS came to essentially the same conclusion:

> For the reasons noted above under spikedace, we believe an analysis of the effects of the proposed action on Complex 6, in which the proposed action occurs is appropriate. After reviewing the current status of the loach minnow, the environmental baseline for the action area, the effects of the proposed reauthorization of livestock grazing on 16 allotments of the Alpine and Clifton Ranger districts of the Apache National Forest, and the cumulative effects, it is our biological opinion that the action, as proposed, is not likely to jeopardize the continued existence of, or destroy or adversely modify designated critical habitat for, the spikedace within complex 6. As noted above under spikedace, in the Final Rule designating critical habitat for spikedace and loach minnow ... we noted that "Because of these species' precarious status, mere stabilization of spikedace and loach minnow at their present levels will not achieve conservation. Recovery through protection and enhancement and enhancement of the existing populations, plus reestablishment of populations in suitable areas of historical range, are necessary for their survival." We believe the action as proposed action will adversely affect the survival and recovery of spikedace for the following reasons:

> *Loach Minnow are limited in distribution to 419 miles of stream. Where they were commonly found throughout much of the Gila River Basin, Salt, San Pedro, and San Francisco subbasins, it is now commonly found only in Aravaipa Creek, the Blue River, and limited portions of the San Francisco, upper Gila, and Tularosa Rivers in New Mexico. It has been reduced in distribution to 15 to 20 percent of its historical range. Because of this limited range and distribution, habitat along the Blue and San Francisco rivers is essential to the survival, and particularly the recovery, of this species.

> *The proposed action covers 279,681 acres which are in degraded riparian, range, soil conditions. The FWS recognizes that, in part, these conditions are due to past actions. Conditions are summarized under conclusions for spikedace above, in Table 11.

> The proposed actions would continue grazing when the environmental baseline is degraded, and we believe continued grazing of this area will perpetuate current conditions or preclude or delay recovery. We are specifically concerned that utilization rates remain higher than suitable on areas that are already degraded. **However, we believe the recent reductions in cattle numbers and seasons of use, combined with removal of the cattle from the mainstem Blue and San Francisco rivers, will prevent the proposed action from jeopardizing the continued existence of the fish, and will not result in adverse modification of habitat. We anticipate that some degradation will continue, as the on-going degradation in this area will take some time to slow, halt, and reverse to improvement of conditions.**

**The conclusions of this biological opinion are based on full implementation of the project as described in the Description of the Proposed Action section of this document, including any conservation that were incorporated into the project design.**

*See* BO at 127–128.

There is support in the administrative record for the FWS's determination that reducing the number of cattle and season of use and removal of cattle from the Blue and San Francisco rivers are effective mitigation measures. As the pertinent agencies recognized, one of the most effective methods for eliminating the effects of grazing on aquatic habitat is to keep livestock out of riparian areas, which the Forest has done along the critical habitat of the Blue and San Francisco Rivers. The FWS recognized that the "Forest Service will continue their commitment to exclude the Blue and San Francisco mainstem riparian corridors from all cattle grazing. This will be important in repairing stream conditions within the Apache National Forest for spikedace and loach minnow." *See* AR at 100. The other mitigation measures FWS relied on in reaching its no jeopardy decision were measures in place to exclude livestock from other areas of critical habitat, loach minnow habitat, and riparian areas of tributaries. *See* AR at 13, 16, 18, 19, 22.

Other mitigation measures were controlling livestock numbers, forage use levels, and the time and season to protect against the effects of grazing, which would improve the habitat for the loach minnow and spikedace. *See* AR at 97, 99. The Forest has reduced the number of livestock grazing on the allotments which decreases utilization, trampling, and destruction of vegetation, which decreases erosion and stability of the watershed. The FWS determined that this resulted in a positive trend in soil cover and stabilization that would continue with the proposed action. *See* AR 97, 99. Seasonal grazing restrictions are also in place on certain allotments, and continuous grazing has been eliminated on others allowing for the growth of more plants. The FWS found that these measures can mitigate the effects of continued grazing. *See* AR 112, 114–115. The FWS also relied on studies indicating that the various mitigation measures at issue can promote the recovery of the habitat for the loach minnow and spikedace.

### III. *Discussion*

Under the Administrative Procedures Act ("APA"), "a court may set aside an agency action if the court determines that action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or without observance of procedure required by law." *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1078 (9th Cir.2001). Thus, this Court may not "substitute its judgment for that of the agency" yet is to consider whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In addition, where an agency's decision involves the agency's scientific and technical expertise, this Court must be "at its most deferential" and defer to the agency's decision if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense Council, Inc.*, 462 U.S. 87, 103, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Ultimately, "the agency must justify its final action by reference to the reasons it considered at the time it acted." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552,

560 (9th Cir.2000) citing *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). However, "[a]n agency is not required ... to furnish detailed reasons for its decision." *Lodi Truck Service, Inc. v. United States*, 706 F.2d 898, 901 (9th Cir.1983). So long as the agency's decision is sufficiently clear such that the court did not speculate as to the bases for the agency's decision, the Court may uphold the decision. *See id.*

In spite of the high degree of deference the Court must give to the FWS's no jeopardy determination, Plaintiff argues the no jeopardy decision must be overturned for several main reasons as discussed below.

Plaintiff argues that the BO is contradictory and not supported by the record, and therefore is arbitrary and capricious. Plaintiff points to many references throughout the BO whereby the FWS recognizes that grazing has had direct adverse affects to the spikedace and loach minnow. Plaintiff also emphasizes that the BO also reflects that continued grazing on the 16 allotments in question will continue to have adverse affects on the spikedace and loach minnow. Indeed, Plaintiff points out that the FWS concluded that the "proposed action will adversely affect the survival and recovery" of the spikedace and loach minnow. *See BO* at 125–128. In light of the numerous explicit findings throughout the BO documenting the historic and continuing adverse affects to the spikedace and loach minnow, Plaintiff argues that FWS's no jeopardy determination directly contradicts the findings of the BO and is not supported by the record.

■ In response, Defendants argue that the FWS's finding of adverse affects to the survival and recovery of the species is not in conflict with the FWS's ultimate conclusion that there is no jeopardy to the species. As discussed earlier, Section 7 of the ESA requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species ..." 16 U.S.C. § 1536(a)(2). In order to achieve this objective, the agency proposing the action must consult with the FWS whenever its action "may affect" a threatened or endangered species. 50 C.F.R. § 402.14(a). If the agency determines that its action will have "no affect" on an endangered or threatened species, it need not engage in "formal consultation," and the FWS need not concur in this determination. *See Southwest Center for Biol. Div. v. United States Forest Service*, 100 F.3d 1443, 1447–48 (9th Cir.1996); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n. 8 (9th Cir. 1994), *cert. denied*, 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995).

■ In light of these regulations, Defendants emphasize that as a threshold matter, a finding of adverse affects to a species is required to even trigger formal consultation. As such, Defendants argue that the fact that the FWS found that there were adverse affects to the survival and recovery of the spikedace and loach minnow does not compel a jeopardy determination. In relation to a jeopardy determination, Defendants argue that as long as the proposed action was "not likely to jeopardize the continued existence of any endangered species," the FWS's no jeopardy conclusion was permissible. 16 U.S.C. § 1536(a)(2). Indeed, " 'Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to **reduce appreciably** the likelihood of both the survival and recovery of a listed species ..." 50 C.F.R. § 402.02 (emphasis added). Although Plaintiff cites dictionary definitions of "appreciably" to mean capable of being perceived or recognized, the Defendants point out that FWS has interpreted similar

terms differently. The FWS has not specifically interpreted the term "reduce appreciably," but it has interpreted the term "appreciably diminish the value of" in relation to destruction or adverse modification to mean "to considerably reduce the capability of designated critical habitat to both the survival and recovery of a listed species." *See* FWS and NMFS, "ESA Section 7 Consultation Handbook," March 1998 at 4–34 (emphasis added). The FWS has also explained in its consultation handbook that "[a]dverse effects on individuals of a species ... do not result in jeopardy ... unless that loss, when added to the environmental baseline, is likely to result in **significant** adverse effects throughout the species' range." As an agency's interpretation of it regulations is entitled to a substantial degree of deference, the Court finds that the interpretation of the regulations advanced by Defendants is more persuasive than Plaintiff's. *See Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1097 (9th Cir.2003)( [T]he Service is entitled to substantial deference to its interpretation of its own regulations ... Indeed, judicial review of an agency's interpretation of its own regulations is limited to ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation.). Accordingly, the Court finds that the FWS's conclusion that "we believe the recent reductions in cattle numbers and seasons of use, combined with removal of the cattle from the mainstem Blue and San Francisco rivers, will prevent the proposed action from jeopardizing the continued existence of the fish ..." is not contradictory to the FWS's earlier conclusions regarding the adverse affects on the survival and recovery of the species. *See* BO at 125–128.

■ Defendants also argue that contrary to Plaintiff's assertions, the record supports FWS's conclusion that the recent reductions in cattle numbers and seasons of use, combined with removal of the cat-

tle from the mainstem Blue and San Francisco rivers, will prevent the proposed action from jeopardizing the continued existence of the fish. The Court agrees. As already discussed above, Defendants have highlighted various portions of the record which support the FWS's conclusion. The FWS recognized that one of the most effective methods for eliminating the effects of grazing on aquatic habitat is to keep livestock out of riparian areas, which the Forest has done along the critical habitat along the Blue and San Francisco Rivers. The FWS also relied on measures in place to exclude livestock from other areas of critical habitat, loach minnow habitat, and riparian areas of tributaries. Other mitigation measures in the record were controlling livestock numbers, forage use levels, and the time and season of grazing to protect against the effects of grazing, which would improve the habitat for the loach minnow and spikedace. The Forest has reduced the number of livestock grazing on the allotments which decreases utilization, trampling, and destruction of vegetation, thereby reducing erosion and stability of the watershed. The FWS determined that this resulted in a positive trend in soil cover and stabilization that would continue with the proposed action. Seasonal grazing restrictions are also in place on certain allotments, and continuous grazing has been eliminated on others allowing for the growth of more plants. The FWS found that these measures can mitigate the effects of continued grazing. Accordingly, the Court finds that in reaching its decision, the FWS considered the relevant factors and articulated a rational connection between the facts and its decision to make a no jeopardy determination. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. 814; *Baltimore Gas & Elec. Co.*, 462 U.S. at 103, 105, 103 S.Ct. 2246; *Marsh v. Oregon Nat'l Re-*

*sources Council,* 490 U.S. at 378, 109 S.Ct. 1851.

█ Plaintiff also argues that as a matter of law, a no jeopardy finding under the ESA must be reasonably certain to occur. To support this proposition, Plaintiff relies on three district court cases. *See American Rivers v. U.S. Army Corps of Engineers,* 271 F.Supp.2d 230, 252 (D.D.C. 2003); *Center for Biological Diversity v. Rumsfeld,* 198 F.Supp.2d 1139, 1152 (D.Ariz.2002); *Northwest Environmental Advocates v. U.S. Environmental Protection Agency,* 268 F.Supp.2d 1255, 1273 (D.Or.2003). Plaintiff argues that throughout the BO, it is established that there is only the potential to address the threats to the species, and that the adverse effects will continue indefinitely. For example, Plaintiff points out a portion of the BO which states that "[i]t is the combination of these diminished environmental baseline conditions and the higher utilization rates that leads us to conclude that continued grazing will result in the further degradation of riparian and river conditions, and reduced condition of some constituent elements." *See* AR at 100. Another portion of the BO states that "some degradation will continue, as the ongoing degradation in this area will take some time to slow, halt, and reverse to improvement of conditions." *See* BO at 128. As such, Plaintiff argues that the no jeopardy finding is contrary to law as it is not reasonably certain.

In response, Defendant argues that Plaintiff's contention that a no jeopardy finding must have a "reasonable certainty of occurring" is not supported by the statute, regulations, or controlling authority. The Court agrees. First, the controlling statute only requires that the proposed action "is **not likely** to jeopardize the continued existence" of an endangered species. 16 U.S.C. § 1536(a)(2) (emphasis added). Further, the current regulation interpreting the statute states that " 'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species . . ." 50 C.F.R. § 402.02. Defendant argues that in the preamble to the current regulations, the agencies rejected changing the word "would" to "could," explaining that such a change would be an "unwarranted deviation" from the "not likely to jeopardize" language in 16 U.S.C. § 1536(a)(2). *See* 51 Fed.Reg. 19,926, 19,935 (June 3, 1986). Thus, the statute and the regulation and its history support the proposition that "not likely" was intended to give the agencies the ability to weigh the probability of a proposed action resulting in jeopardy.

Defendant also cites Ninth Circuit authority which supports this position; the Ninth Circuit has held that "[w]hen an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.' " *See Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336–1337 (9th Cir.1992)(upholding a no jeopardy decision "[d]espite the uncertainty of the data" because the agency based its decision on the best available scientific data and considered the relevant factors). Defendant also correctly points out that the three district court cases relied on by Plaintiff are not controlling authority. In addition, Defendant argues that these cases are distinguishable as those courts addressed the degree of certainty that mitigation measures would be implemented before they could be considered in a no jeopardy determination, as opposed to the degree of certainty necessary to determine if a proposed action will jeopardize the continued existence of a species. *See* De-

fendants' Reply Brief at 4–5; *American Rivers*, 271 F.Supp.2d 230, 252–253; *Center for Biological Diversity*, 198 F.Supp.2d 1139, 1153; *Northwest Environmental Advocates v. U.S. Environmental Protection Agency*, 268 F.Supp.2d 1255, 1273. Here, as Defendants emphasize, the mitigation measures in question will be implemented as the reduction in number of livestock and prohibition on grazing were in place during consultation, were enforceable as part of the grazing permits, and the BO also requires the Forest to reinitiate consultation for the FWS to reevaluate its no jeopardy determination if other mitigation measures are not followed.

█ Lastly, Defendants argue that Plaintiff's contention that the BO shows that the mitigation measures only had the potential to avoid jeopardy is incorrect. Further, Defendant argues the fact that some adverse affects will continue under the action does not compel a jeopardy determination. Although the BO does in fact recognize the historic and continuing adverse affects of grazing, the FWS ultimately determined based on its scientific expertise that because of the mitigation measures in question, the proposed action was not likely to jeopardize the spikedace and loach minnow: "However, we believe the recent reductions in cattle numbers and seasons of use, combined with removal of the cattle from the mainstem Blue and San Francisco rivers, **will prevent** the proposed action from jeopardizing the continued existence of the fish, and will not result in adverse modification of habitat. We anticipate that some degradation will continue, as the on-going degradation in this area will take some time to slow, halt, and reverse to improvement of conditions." *See* BO at 127. Further, as already discussed above, there is support in the record for this determination which supports the FWS's finding of no jeopardy from the proposed action.

Accordingly, based on the foregoing, the Court finds that the FWS's no jeopardy determination must be upheld because it is based upon a consideration of the relevant factors and that there has been no clear error of judgment. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. 814. Based upon the best scientific evidence in the administrative record and the FWS's explanations for the no jeopardy determination, the Court finds that the FWS considered the relevant factors based upon the scientific data before it, and articulated a rational connection between the facts and its decision to make a no jeopardy determination. *See, e.g., Baltimore Gas & Elec. Co.*, 462 U.S. at 103, 105, 103 S.Ct. 2246. *See also Marsh v. Oregon Nat'l Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("... [A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). Thus, under the deferential standard of review applicable to this case, the Court finds that the FWS's no jeopardy determination relating to the spikedace and loach minnow was in compliance with the ESA and the APA.

## IV. *Conclusion*

Accordingly, IT IS HEREBY ORDERED as follows:

(1) Plaintiff's Motion for Summary Judgment is **denied** and Defendant's Cross–Motion for Summary Judgment is **granted.**

(2) This case is **dismissed with prejudice.**

(3) The **Clerk of the Court shall close the file in this matter.**