**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON NATURAL RESOURCES
COUNCIL; KLAMATH SISKIYOU
WILDLANDS CENTER; CASCADIA
WILDLANDS PROJECT; SISKIYOU
REGIONAL EDUCATION PROJECT;
FRIENDS OF THE LIVING OREGON
WATERS; NATIONAL CENTER FOR
CONSERVATION SCIENCE AND POLICY,
        *Plaintiffs-Appellants,*

v.

DAVID B. ALLEN, in his official
capacity as Regional Director for
the United States Fish and
Wildlife Service's Pacific Region;
U.S. FISH & WILDLIFE SERVICE,
        *Defendants-Appellees.*

No. 05-35830

D.C. No.
CV 03-0888 PA

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, District Judge, Presiding

Argued and Submitted
July 28, 2006—Portland, Oregon

Filed February 16, 2007

Before: Alfred T. Goodwin, A. Wallace Tashima, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Tashima

## COUNSEL

Kristen L. Boyles, Earthjustice, Seattle, Washington, for the plaintiffs-appellants.

R. Justin Smith, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Mark C. Rutzick, Portland, Oregon, for *amicus curiae* American Forest Resource Council.

## OPINION

TASHIMA, Circuit Judge:

As a result of this court's opinion in *Gifford Pinchot Task Force v. United States Fish & Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004), the Fish and Wildlife Service ("FWS") voluntarily reinitiated consultation with two federal agencies regarding the impact of a portion of a proposed timber harvest on the endangered northern spotted owl. The FWS accordingly withdrew its favorable Biological Opinion ("BiOp" or "2001 BiOp") regarding that portion of the timber harvest, but did not withdraw the accompanying Incidental Take Statement, which would authorize the taking of "all" northern spotted owls associated with the full timber harvest. The Oregon Natural Resources Council and several other conservation groups (collectively, "ONRC") challenge the validity of this Incidental Take Statement. We have jurisdiction under 28 U.S.C. § 1291. We hold that the Take Statement is invalid because: (1) the withdrawal of a portion of the BiOp leaves the Incidental Take Statement without an underlying factual predicate; (2) the Incidental Take Statement presents a non-numerical measure of take without explaining why no number was provided; and (3) the Incidental Take Statement sets a measure of take that does not allow for reinitiation of consultation.

## I. BACKGROUND

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, evidences a congressional intent to afford endangered species the highest of priorities. *TVA v. Hill*, 437 U.S. 153, 194 (1978). "The plain intent of Congress in enacting this

statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. To accomplish this ambitious goal, the ESA sets forth a comprehensive program to limit harm to endangered species within the United States. Section 9 of the ESA establishes a blanket prohibition on the taking[1] of any member of a listed endangered species. 16 U.S.C. § 1538(a)(1)(B). Section 7 affirmatively commands each federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). However, § 7 carves out limited exceptions for federal agencies and certain statutorily-defined "applicants," allowing those contemplating action that may harm endangered species to obtain a limited exemption from penalties under certain circumstances.[2] 16 U.S.C. § 1536(a)-(c), (*o*); 50 C.F.R. § 402.02.

Under § 7, if any listed (or proposed listed) species may be present in the area of the proposed action, the federal agency (the "action agency") must conduct a biological assessment in order to determine the likely effect of its proposed action on the species. 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R.

---

[1]The ESA defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm," in this context, is "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 691 (1995).

[2]Section 10 of the ESA also authorizes the issuance of incidental take permits to private parties. 16 U.S.C. § 1539. Historically, however, only a small number of § 10 permits actually issue. *See Ramsey v. Kantor*, 96 F.3d 434, 442 n.15 (9th Cir. 1996). Section 7 also establishes a limited procedure by which agencies may attempt to exempt a project from the ESA by applying to the Endangered Species Committee. *See* 16 U.S.C. § 1536(e)-(p); *see generally Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534 (9th Cir. 1993) (discussing Committee's role).

§ 402.02. If the action agency concludes that its proposed action may affect listed species or critical habitat, it must initiate consultation with the FWS or the National Marine Fisheries Service. *See* 50 C.F.R. § 402.14.

In 2001, the Bureau of Land Management and the Forest Service ("agencies") desired to conduct approximately 75 timber sales on 64,006 acres of federally-managed land in the Pacific northwest, primarily within the Rouge River Basin in Oregon. These forests also house the northern spotted owl, *strix occidentalis caurina*, a listed threatened species. *See* 50 C.F.R. § 17.11(h). The agencies conducted a biological assessment of the proposed sales and concluded that the sales may affect the northern spotted owl, as well as three other listed species. The agencies initiated formal consultation with the FWS.

During the consultation process, the FWS assessed the proposed action for its potential to harm the spotted owl and other endangered species and their critical habitat. *See* 50 C.F.R. § 402.14(g). The FWS summarized its findings in a BiOp, issued in October 2001. *See* 50 C.F.R. § 402.14(g)-(h). The BiOp found that the proposed timber harvest would remove 22,227 acres of forest designated as spotted owl suitable habitat (*i.e.*, habitat suitable for nesting, roosting and/or foraging). The timber harvest would impact 10,443 acres of spotted owl critical habitat,[3] removing or downgrading 5,383

---

[3]The FWS has designated a total of approximately 6.9 million acres of forest lands as the northern spotted owl's "critical habitat," *i.e.*:

> (i) the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management consideration or protection; and (ii) specific areas outside the geographical area occupied by the species . . . upon a determination . . . that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A); *see* Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Northern Spotted Owl, 57 Fed. Reg. 1,796, 1,809 (Jan. 15, 1992).

acres of nesting, roosting, and foraging critical habitat, degrading 2,168 acres of nesting, roosting, and foraging critical habitat, removing 563 acres of dispersal[4] critical habitat and degrading 2,329 acres of dispersal critical habitat. Nevertheless, the BiOp concluded, the anticipated harvest "[was] not likely to jeopardize the existence of the spotted owl . . . and [was] not likely to destroy or adversely modify designated critical habitat for the spotted owl."

When the FWS concludes that an action will not jeopardize the existence of a listed species or adversely modify its habitat, but the project is likely to result in incidental takings of listed species, the FWS must provide a written statement with the BiOp that authorizes such takings. 16 U.S.C. § 1536(b)(4), (*o*); *Ariz. Cattle Growers' Ass'n v. U. S. Fish & Wildlife*, 273 F.3d 1229, 1233 (9th Cir. 2001). The Incidental Take Statement must: (1) specify the impact of the incidental taking on the species; (2) specify the "reasonable and prudent measures" that the FWS considers necessary or appropriate to minimize such impact; (3) set forth "terms and conditions" with which the action agency must comply to implement the reasonable and prudent measures (including, but not limited to, reporting requirements); and (4) specify the procedures to be used to handle or dispose of any animals actually taken. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). As long as any takings comply with the terms and conditions of the Incidental Take Statement, the action agency is exempt from penalties for such takings. 16 U.S.C. § 1536(*o*)(2). Thus, a BiOp with a no-jeopardy finding effectively green-lights the proposed action under the ESA, subject to the Incidental Take Statement's terms and conditions. *See Bennett v. Spear*, 520 U.S. 154, 169-71 (1997) (noting that, while a BiOp is techni-

---

[4]According to the FWS, dispersal habitat consists of trees of adequate size and canopy closure to protect owls from predators as they move within their range. 57 Fed. Reg. at 1,798. Although it may be marginal or unsuitable for nesting, roosting or foraging, dispersal habitat serves to link owl subpopulations and blocks of owl nesting habitat. *Id.*

cally advisory only, an agency disregards the BiOp "at its own peril").

However, the ESA's implementing regulations require the agencies completing the project to report back to the FWS on the action's progress and its impact on the species "[i]n order to monitor the impacts of incidental take." 50 C.F.R. § 402.14(i)(3). The agency must immediately reinitiate consultation with the FWS if the amount or extent of incidental taking is exceeded. 50 C.F.R. §§ 402.14(i)(4), 402.16(a).[5]

The 2001 BiOp's accompanying Incidental Take Statement authorized the "incidental take of all spotted owls associated with the removal and downgrading of 22,227 acres of suitable spotted owl habitat." The Reasonable and Prudent Measures include the following statement: "The Service believes that the following reasonable and prudent measures are necessary and appropriate to minimize the impacts of incidental take of the spotted owl . . . [:] Provide appropriate amounts of spotted owl dispersal and suitable habitat in a condition and distribution that facilitates spotted owl movement across the landscape." The Terms and Conditions specify procedures for handling species specimens and require that certain of the timber harvest projects be reviewed for consistency with the BiOp. The Terms and Conditions also require the agencies to report annually on the "actual impacts of the proposed projects," and state that "[i]f take is exceeded, consultation will have to be reinitiated."

---

[5]The action agency must also reinitiate consultation with the FWS if: (1) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (2) a modification to the action affects listed species or critical habitat in a way that was not considered in the BiOp; or (3) newly listed species or newly designated critical habitat may be affected by the identified action. 50 C.F.R. § 402.16(b)-(d).

## II.  PROCEEDINGS BELOW

In 2003, ONRC commenced this action, challenging the validity of the BiOp and the Incidental Take Statement. The district court granted defendants' motion for summary judgment in February 2004, and ONRC appealed.

While this case was pending on appeal, we decided *Gifford Pinchot*. We held that the definition of "destruction or adverse modification" of critical habitat employed by the FWS in assessing jeopardy to the northern spotted owl violated the ESA. *Gifford Pinchot*, 378 F. 3d at 1069-75. The definition in use "set[ ] the bar too high" by finding adverse modification only where proposed actions impacted "both the survival *and* recovery of a listed species." *Id.* at 1069 (emphasis added). We ordered this case remanded to the district court for consideration in light of *Gifford Pinchot*'s relevant holdings. *See Or. Natural Res. Council v. Allen*, 124 Fed. App'x 555 (9th Cir. Mar. 9, 2005).

The FWS subsequently acknowledged that *Gifford Pinchot* rendered a portion of the 2001 BiOp invalid. It voluntarily reinitiated consultation on the land designated as northern spotted owl critical habitat, represented by the FWS to be 5,383 acres. Based on this action, the district court found that the only live issue presented was the continuing validity of the Incidental Take Statement. The district court concluded that the original Incidental Take Statement remained valid despite the partial withdrawal of the BiOp, and again granted summary judgment in favor of the FWS. ONRC again appeals the validity of the Incidental Take Statement, arguing that: (1) the FWS' voluntary reinitiation of consultation on some of the timber sales approved by the BiOp renders the Incidental Take Statement invalid; and (2) the Incidental Take Statement fails to quantify adequately the authorized take of northern spotted owls or explain why no number was provided.

## III.   ANALYSIS

### A.   Standard of Review

The BiOp and its accompanying Incidental Take Statement represent final agency action subject to judicial review. *Bennett*, 520 U.S. at 177-78. As the ESA does not itself specify a standard of review of its implementation, we apply the general standard of review of agency action established by the Administrative Procedure Act ("APA"). *See id.*; 5 U.S.C. §§ 701-706. The Incidental Take Statement is thus subject to review under the arbitrary and capricious standard found in the APA. *See* 5 U.S.C. §§ 704, 706. We review the district court's grant of summary judgment *de novo*. *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006). Thus, we must determine whether there is a rational connection between the facts found and the choices made by the FWS and whether it has committed a clear error of judgment. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1243.

Review under the arbitrary and capricious standard is to be "narrow," but "searching and careful." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). The Supreme Court has explained that an agency action is arbitrary and capricious if "the agency has . . . entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court cannot, however, substitute its judgment for that of the agency or merely determine that it would have decided an issue differently. *Marsh*, 490 U.S. at 377.

### B.   Withdrawal of a Material Portion of the BiOp Renders the Incidental Take Statement Invalid.

ONRC contends that reinitiating consultation on the portion of the timber sales impacting northern spotted owl critical habitat materially changed the scope of the BiOp, necessitating a new Incidental Take Statement. We agree. Even a cur-

sory review of the regulations governing formal consultation demonstrates that Incidental Take Statements supplement BiOps, and were not meant to stand alone.

**[1]** The FWS must issue an Incidental Take Statement if the BiOp concludes no jeopardy to listed species or adverse modification of critical habitat will result from the proposed action, but the action is likely to result in incidental takings. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1242. Both the BiOp and the Incidental Take Statement must be formulated by the FWS during the formal consultation process; indeed, the regulations specifically require the FWS to provide the Incidental Take Statement "with the biological opinion." 50 C.F.R. § 402.14(g), (i)(1).

The Incidental Take Statement must be associated with an underlying BiOp because the Incidental Take Statement's primary function is to authorize the taking of animals incidental to the execution of a particular proposed action. The approval is effectively conveyed through the BiOp's "no jeopardy" determination. *See* 50 C.F.R. § 402.14(g)-(h); *Bennett*, 520 U.S. at 169-71. Without the "no jeopardy" determination contained in the underlying BiOp, the Incidental Take Statement potentially pre-authorizes take for an action that could subsequently be determined to jeopardize the existence of an endangered species. Such a result would be contrary to the ESA's fundamental purpose and scheme. *See* 16 U.S.C. §§ 1531(b)-(c), 1538(a)(1)(B).

Moreover, under the ESA's implementing regulations, in order to be considered a proper taking, the taking must be incidental to the purpose of the action. 50 C.F.R. § 402.02; *see also* 16 U.S.C. § 1536(b)(4) (providing for authorization of takings incidental to approved agency actions). Without understanding the scope and purpose of the action itself — information contained in the BiOp — there is no way to know whether the take being authorized is properly "incidental."

**[2]** The facts of this case acutely demonstrate the Incidental Take Statement's necessarily auxiliary nature. Here, the 2001 BiOp initially approved timber sales impacting 22,227 acres of suitable habitat for the northern spotted owl. The FWS has withdrawn its approval of the logging of at least 5,383 acres of critical habitat. However, the accompanying Incidental Take Statement — contained within the 2001 BiOp — authorized the taking of all spotted owls associated with the removal or downgrading of 22,227 acres of suitable spotted owl habitat, which may include most or all of the critical habitat acreage at issue. Thus, as it stands, the Incidental Take Statement is now broader than the project and allows for the take of more spotted owls than are affected by the remaining portions of the BiOp. Allowing the Incidental Take Statement to stand alone would also presuppose the reapproval of the timber harvest on spotted owl critical habitat, even though the FWS has acknowledged that the action's propriety must be reevaluated in the light of the proper definition of destruction or adverse modification of critical habitat.

**[3]** Because there is no rational connection between the authorization of take and the scope of the underlying proposed action, we conclude that the Incidental Take Statement is arbitrary and capricious. *See Ariz. Cattle Growers' Ass'n*, 373 F.3d at 1243.

### C. The Incidental Take Statement Is Invalid Because the FWS Failed to Establish that it Could Not Set a Numerical Measure of Take.

Congress has clearly declared a preference for expressing take in numerical form, and an Incidental Take Statement that utilizes a surrogate instead of a numerical cap on take must explain why it was impracticable to express a numerical measure of take. Because the Incidental Take Statement at issue contains no numerical cap on take and fails to explain why it does not, it violates the ESA.

**[4]** Section 7 of the ESA requires Incidental Take Statements to specify the "impact" of the incidental takings on the species. 16 U.S.C. § 1536(b)(4)(i). In its discussion of § 7(b)(4), Congress indicated that it preferred the Incidental Take Statement to contain a numerical value: "Where possible, the impact should be specified in terms of a numerical limitation on the Federal agency or permittee or licensee." H.R. Rep. No. 97-567, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2827. Congress recognized, however, that a numerical value would not always be available: "The Committee recognizes . . . it may not be possible to determine the number of eggs of an endangered or threatened fish which will be sucked into a power plant when water is used as a cooling mechanism. The Committee intends only that such numbers be established where possible." *Id.*

**[5]** Accordingly, we have recognized that the permissible level of take ideally should be expressed as a specific number. *See Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249 (referencing, as examples of numerical limitations, several cases in which the Incidental Take Statements stated the specific number of species members that would be affected). Further, if it does employ some other measure, "the Fish and Wildlife Service must establish that no such numerical value could be practically obtained." *Id.* at 1250.

**[6]** Contrary to the FWS' argument, "quantifying" take in terms of habitat acreage lost is simply not the type of numerical limitation on take contemplated by Congress or this court's precedent. Moreover, the BiOp offers no explanation of why the FWS was unable numerically to quantify the level of take of northern spotted owls. The BiOp's appendix declares that "spotted owl survey data are currently out-of-date and surveys have been discontinued or reduced." The FWS, however, never states that it is not possible to update the survey data in order to estimate the number of takings, only that it has not actually done the surveys. This does not establish the numerical measure's impracticality. We there-

fore conclude that the FWS' unexplained failure to comply with this requirement renders the Incidental Take Statement invalid. *See id.*; *cf. Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1137-38 (N.D. Cal. 2006) (finding that the FWS did not adequately establish that no numerical value of take of desert tortoises could practically be obtained where Incidental Take Statement relied on fact that the Service simply had not estimated the number of desert tortoises in the action area); *Natural Res. Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1184-85 (N.D. Cal. 2003) (rejecting Incidental Take Statement that failed to quantify numerically the authorized incidental take of some twenty endangered species and offered no evidence that it was impractical to obtain such numerical estimates).

### D.    The Incidental Take Statement Does Not Provide for Reinitiation of Consultation.

[7] As discussed above, Congress preferred take "be specified in terms of a numerical limitation." H.R. Rep. No. 97-567, at 27 (1982). A surrogate is permissible if no number may be practically obtained. The chosen surrogate, however, must be able to perform the functions of a numerical limitation. In particular, Incidental Take Statements "set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate consultation." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249. Because it would allow the take of "all spotted owls" associated with the project, the Incidental Take Statement would not allow for reinitiation of consultation and is therefore not a proper surrogate.

[8] We have previously invalidated Incidental Take Statements that could not adequately trigger reinitiation of consultation. For example, in *Arizona Cattle Growers' Ass'n*, we invalidated an Incidental Take Statement because it did not contain measurable guidelines to determine when incidental

take would be exceeded. *See id.* at 1249-51. In that case, the FWS formally consulted with the Bureau of Land Management regarding the proposed issuance of grazing permits. *Id.* at 1233-34. The FWS issued a BiOp containing several Incidental Take Statements. One Incidental Take Statement, noting that it would "be difficult to detect" incidental takings of loach minnows from a particular allotment, instead attempted to define the threshold of impermissible take using habitat characteristics. *Id.* at 1248. The Incidental Take Statement stated that it would consider the permissible level of take to be exceeded if "[e]cological conditions do not improve under the proposed livestock management" plan. *Id.* The Incidental Take Statement then listed various components of the ecological landscape, the "improvement" of which would count as improving "ecological conditions." *Id.* at 1249.

We explained that ecological conditions could be used as a surrogate for defining the amount or extent of take if the conditions were linked to the take of the protected species. *Id.* at 1250. If, however, the FWS chooses to employ a non-numerical surrogate, the surrogate must not be so general that the applicant or the action agency cannot gauge its level of compliance. *Id.* at 1250-51. The Incidental Take Statement faltered because its directive to "improve" ecological conditions was too vague for the permit applicant or the Bureau of Land Management to measure its performance. *Id.* at 1250. Instead, the Take Statement purported to charge the applicant with the general ecological improvement of 22,000 acres of land. *Id.* at 1251. Because it did not set a clear standard for determining when the authorized level of take had been exceeded, we held the Incidental Take Statement to be arbitrary and capricious. *Id.*; *see also Natural Res. Def. Council, Inc.*, 279 F. Supp. 2d at 1185-87 (rejecting Incidental Take Statement which purported to set the impermissible level of take at "any individual" because, *inter alia*, such a take statement could not trigger reinitiation of consultation, as it was extremely unlikely that the taking of a single marine animal would actually be detected); *Nat'l Wildlife Fed'n v. Nat'l*

*Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1160 (W.D. Wash. 2002) (finding that plaintiffs were likely to succeed on their claim that an incidental take surrogate that, "in effect, amounts to the project's required work conditions," was invalid).

**[9]** The Incidental Take Statement in this case suffers from the same infirmity as the Incidental Take Statement in *Arizona Cattle Growers' Ass'n* in that it too fails to set forth a trigger that would invalidate the safe harbor provision and reinitiate the consultation process. Here, the authorized level of take, "all spotted owls associated with the removal and downgrading of 22,227 acres of suitable spotted owl habitat," cannot be reached until the project itself is complete. Even if the actual number of takings of spotted owls that occurred during the project was considerably higher than anticipated, the Incidental Take Statement would not permit the FWS to halt the project and reinitiate consultation. Instead, the permissible level of take is coextensive with the project's own scope.[6] The Incidental Take Statement and BiOp are rendered tautological, they both define and limit the level of take using the parameters of the project.[7]

---

[6]Indeed, as discussed above, it actually exceeds the scope of the project, as the BiOp has been withdrawn with respect to the portion of the proposed harvest within the northern spotted owl's critical habitat.

[7]This shortfall is exacerbated by the Incidental Take Statement's failure to provide any meaningful measures to attempt to minimize incidental takings associated with the project. As a part of a take statement, the FWS must specify "those reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(ii); *see also* 50 C.F.R. § 402.14(i)(1)(ii). The measures may not alter the project's scope, but should be "minor changes" to the project aimed at minimizing take, as required by § 7 of the ESA. 50 C.F.R. § 402.14(i)(2). The FWS Section 7 Consultation Handbook provides as examples concrete activities that may allow those implementing the project to reduce the number of animals taken, such as education of employees about the species, reduction of predation of the species, removal or avoidance of the species, or monitoring. Final ESA Section 7 Consultation Handbook, March 1998 at 4-50.

The FWS argues that, despite our holding in *Arizona Cattle Growers' Ass'n*, Incidental Take Statements need not allow for reinitiation of consultation. Instead, Incidental Take Statements serve only to lift § 9's bar on take. This interpretation of § 7(b)(4) ignores the limited nature of the take statement's exemption from penalty. Further, it reads out the statutory and regulatory provisions for and congressional expectations of the monitoring of incidental take during the project.

As discussed above, § 9 of the ESA issues a blanket prohibition on the taking of any member of a listed species. 16 U.S.C. § 1538(a)(1)(B). Section 7 and its implementing regulations affirm that this prohibition applies to federal agencies, and provide carefully limited exemptions. 16 U.S.C. § 1536(*o*)(2). Throughout the biological assessment and formal consultation process, it is incumbent upon the agency to show that the project will not jeopardize or adversely affect the critical habitat of any listed species. *See* 50 C.F.R. §§ 402.12, 402.14. Generally, the project may be exempt from the blanket prohibition on takings only if it does not place any listed species in jeopardy and does not adversely modify listed species' critical habitat. 16 U.S.C. §§ 1536(b)(4), (*o*)(2).

The exemption from liability for take is further limited by the ESA's implementing regulations. "Incidental take" must be truly incidental and may not be the purpose of the action. 50 C.F.R. § 402.02. The take must be in compliance with the terms and conditions of the Incidental Take Statement. 50 C.F.R. § 402.14(i)(5). Finally, the action agency must reiniti-

---

Here, the Incidental Take Statement sets out only one Reasonable and Prudent Measure related to the spotted owl. It states that, to minimize take, a reasonable and prudent measure would be to "[p]rovide appropriate amounts of spotted owl dispersal and suitable habitat in a condition and distribution that facilitates spotted owl movement across the landscape." We are unable to extract any meaning from this sentence; neither the Forest Service, the Bureau of Land Management, nor the prospective loggers, will be able magically to "provide" habitat for the spotted owls.

ate consultation with the FWS if: (1) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (2) a modification to the action affects listed species or critical habitat in a way that was not considered in the BiOp; or (3) newly listed species or newly designated critical habitat may be affected by the identified action. 50 C.F.R. § 402.16(b)-(d). Thus, the ESA and its regulations seek to circumscribe and limit the Incidental Take Statement's exemption from liability.

The regulations governing Incidental Take Statements also provide for ongoing monitoring of incidental take by the action agency and the FWS. 50 C.F.R. § 402.14(i)(3) instructs the action agency or applicant to monitor the impacts of incidental take by reporting on the project's impact on the species "as specified in the incidental take statement." The regulation further instructs the action agency to reinitiate consultation immediately if the amount or extent of specified take is exceeded in the course of the action. 50 C.F.R. § 402.14(i)(4). The FWS' own Consultation Handbook terms this point "reinitiation level." Final ESA Section 7 Consultation Handbook, March 1998 at 4-47. Thus, "[t]he terms of an Incidental Take Statement do not operate in a vacuum. To the contrary, they are integral parts of the statutory scheme, determining, among other things, when consultation must be reinitiated." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1251.

Finally, the House Committee Report regarding the addition of § 7(b)(4) shows that, contrary to the FWS' argument, Congress anticipated that Incidental Take Statements would allow for reinitiation of consultation: "If the specified impact on the species is exceeded, the Committee expects that the Federal agency or permitee or licensee will immediately reinitiate consultation since the level of taking exceeds the impact specified in the initial Section 7(b)(4) statement." H.R. Rep. No. 97-567, at 27 (1982).

Authorizing the take of "all spotted owls," without any additional limit, is inadequate because it prevents the action agencies from fulfilling the monitoring function the ESA and its implementing regulations clearly contemplate. The FWS' interpretation of the function of an Incidental Take Statement reads out of the statute the possibility of a revived consultation, rendering the monitoring and reinitiation provisions of the regulations meaningless. Its interpretation would impermissibly expand the Incidental Take Statement's liability exemptions beyond the scope that has been established by Congress and by the ESA's implementing regulations.

**[10]** The FWS strenuously argues that its decision to employ habitat as a surrogate for take is entitled to *Chevron* deference and may not be disturbed by the Court. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). We agree that the FWS, in fashioning a new Incidental Take Statement, may, in its discretion, certainly rely on a surrogate method, such as habitat, to determine the timber harvest's impact on the spotted owl. The salient point here, however, is that no matter what kind of limitation on take the FWS chooses to place in the Incidental Take Statement, it cannot be so indeterminate as to prevent the Take Statement from contributing to the monitoring of incidental take by eliminating its trigger function.

## IV. CONCLUSION

**[11]** We conclude that the Incidental Take Statement at issue in this case is arbitrary and capricious on several counts. First, because the underlying BiOp has been withdrawn, the Incidental Take Statement lacks a rational basis. Second, the Take Statement fails to provide a numerical limit on take without explaining why such a limit is impracticable to obtain and employ. Third, this Circuit has previously invalidated Incidental Take Statements that could not adequately trigger reinitiation of consultation. The Incidental Take Statement as currently drafted could never trigger the reinitiation of consul-

tation because, by definition, the permissible take level is coextensive with the scope of the project.

**[12]** For all these reasons, we reverse the judgment of the district court and remand to the district court with instructions to grant summary judgment in favor of plaintiffs regarding the invalidity of the Incidental Take Statement.

**REVERSED and REMANDED with instructions.**